**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ | : | |
| MONICA DIDIER, | : | |
| | : | Civ. No. 13-0176 (FLW) |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| DOW JONES COMPANY, INC., | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**WOLFSON, United States District Judge:**

Before the Court is a Complaint filed by Plaintiff Monica Didier ("Plaintiff" or "Didier") against her former employer, Defendant Dow Jones Company, Inc. ("Defendant" or "Dow Jones"), arising out Plaintiff's involuntary termination. Specifically, Plaintiff alleges, under 42 U.S.C. § 1981 and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.* ("NJLAD"), that she was unlawfully discriminated against based on her race, ancestry, and/or ethnic characteristics, and/or that she was retaliated against for her complaints of discrimination.[1] Defendant moves for summary judgment on Plaintiff's claims, which Plaintiff opposes. For the reasons that follow, the Court grants Defendant's motion for summary judgment.

---

[1]     This Court has original jurisdiction over Plaintiff's § 1981 claim pursuant to 28 U.S.C. § 1331, and supplementary jurisdiction over Plaintiff's NJLAD claim pursuant to 28 U.S.C. § 1367.

## I.   BACKGROUND

The following facts underlying Plaintiff's claims are undisputed unless otherwise noted.[2] Dow Jones publishes news and financial information in its publications *The Wall Street Journal* and *The Wall Street Journal Europe*, and on its website, WSJ.com, among others, and seeks to create a reputation of reporting information "as accurate as it can be."  Def. Facts, ¶¶ 1-2, 6.  From 1996 until her termination in 2011, Plaintiff was employed by Dow Jones in its Market Data Group (the "MDG").  *Id.* at ¶ 3.  During her tenure at Dow Jones, Plaintiff worked as a data integrity analyst, and her job duties generally included collecting dividend data from different sources, and inputting that data into the corporate section of *The Wall Street Journal* for publication.  *Id.* at ¶ 4. In line with these duties, Plaintiff was required to ensure, independently, that the information she submitted for publication was accurate—indeed, it was a critical part of her job to check for errors and fix those she found.  *Id.* at ¶¶ 7-8. Prior to 2011, Plaintiff generally performed her job satisfactorily—never receiving any official, written discipline—and oftentimes received reviews indicating that her work was excellent.  *See id.* at ¶ 5; Pl. Resp. Facts, ¶ 5.

At one point in or around January 2007, for the first time since she began working at Dow Jones, Plaintiff applied for a promotion to the position of senior data integrity analyst.  Def. Facts, ¶ 9.  Plaintiff spoke with one of her supervisors, Michelle Mischutin, about her promotion application; although the parties dispute the substance of this conversation, it is undisputed that Mischutin indicated to Plaintiff that, in order to be competitive for the position, an applicant would need to demonstrate proficiency in several areas of his or her work.  *See id.* at ¶ 10; Pl. Resp. Facts, ¶ 10.  Nevertheless, it is undisputed that Plaintiff was never prevented from applying for the

---

[2]     On these motions for summary judgment, the Court draws on the parties' L. Civ. Rule. 56.1 statements of undisputed material facts, citing thereto; additional or disputed facts will be noted when appropriate, and cited to the record accordingly.

position by anyone in Dow Jones' management, and indeed, Plaintiff followed the standard promotion procedures at Dow Jones, and agreed to by Plaintiff's union, and had her application accepted.  Def. Facts, ¶ 9, 13, 16.  Ultimately, Plaintiff's coworker, Liz Jia, was promoted in February 2007 to the position instead of Plaintiff; apart from that single instance, Plaintiff never submitted an application for promotion during the rest of her time at Dow Jones.  *Id.* at ¶ 14.

Beginning around the middle of 2010, Dow Jones reorganized the MDG, including automating a portion of the dividends collection and reporting work handled by Plaintiff, and assigned Plaintiff a new job title and the additional task of statistics reporting.  *See id.* at ¶ 18.  Plaintiff's core discrimination and retaliation claims focus on events and actions that occurred after this reorganization.

In January or February 2011, Plaintiff, who is black, complained to the MDG department head, Chris McCullough, that she was being treated unfairly with respect to her work duties and vacation schedule because of the color of her skin.  Pl. Counter. Facts, ¶¶ 1, 24. Sometime thereafter, in or around February 2011, Plaintiff was informed that her work hours were being changed from 10:30 a.m. to 6:30 p.m. to 11:00 a.m. to 7:00 p.m.[3]  Def. Facts, ¶ 19.  Plaintiff was told that these changes were made (i) because the previous work hours, *i.e.*, employees leaving at 6:00 p.m., was creating a backlog of work in the evening; Dow Jones' managers therefore determined that it was in everyone's best interest to have appropriate employees stay until 7:00 p.m. to complete the last tables of the day, and (ii) to conform Plaintiff's work schedule with other data integrity analysts.  *Id.* at ¶¶ 19, 31-32.  Plaintiff nevertheless believed the change was

---

[3]     Defendant disputes whether Plaintiff complained about being treated differently because of her race *before* her hours were changed, contending that Plaintiff's deposition testimony is unclear.  However, I find that Plaintiff's testimony sufficiently demonstrates that Plaintiff has a recollection of meeting with McCullough prior to her hours being changed.  *See* Pl. Dep., T38:23-T41:14.

discriminatory and/or retaliatory because it was her understanding that all of her work obligations would always be completed by 6:00 p.m. *Id.* at ¶¶ 31-32; Pl. Counter. Facts, ¶ 24. After she learned that her hours were being changed, Plaintiff again met with McCullough. Def. Facts, ¶ 21. At that meeting, Plaintiff complained to McCullough that the change in hours negatively affected her personal life, and that she felt her hours were being changed mainly because of the color of her skin. *Id.* at ¶¶ 21-22; *see also* Pl. Dep., T27:19-21. Similarly—and despite the fact that all of Plaintiff's other coworkers worked the same hours as Plaintiff's new schedule—Plaintiff further complained that she felt that she was being singled out with these new hours. Def. Facts, ¶ 23, 30. Plaintiff then inquired as to whether her hours would ever revert to her previous schedule and, if not, whether there were other "options" for her employment with Dow Jones, including the possibility of a severance package. *See* Pl. Counter. Facts, ¶ 27.[4] Plaintiff was later presented with a severance package amounting to approximately $24,000, first shortly after her second meeting with McCullough in early 2011, and at several other times throughout the spring months of 2011.[5] *Id.* at ¶¶ 27-29. None of these offers were ever accepted by Plaintiff.

Around the same time that Plaintiff met with McCullough to complain about her hours and perceived discriminatory treatment, Plaintiff also discussed similar concerns with another one of her supervisors, Kevin McKay, the assistant director of the MDG who reported to McCullough. Def. Facts, ¶ 23. Plaintiff recalls that, in response to her complaint, McKay indicated that he would

---

[4]     Plaintiff disputes whether she actually requested a severance package. I address this dispute, *infra*, in my analysis of Plaintiff's claims; as that analysis makes clear, whether or not Plaintiff requested a severance package is not material to the resolution of Plaintiff's discrimination and retaliation claims.

[5]     Plaintiff's union also was aware of the settlement package. *See* Pl. Opp., Ex. I (email from Stegman referencing that union had heard back from Plaintiff regarding the severance package offer).

get back to her; however, Plaintiff never had any further discussions or direct interactions with McKay prior to her termination in July 2011. *Id.* at ¶ 27 n.4; Pl. Counter. Facts, ¶ 25.

During the first half of 2011, Plaintiff made numerous errors in her work, particularly in the newer area of her responsibilities with statistics compilation and publication.[6]  For example, on January 7, 2011, Plaintiff released a statistical table titled "A week in the life of the DJIA," in which the percentage change column of the table read "9999.99" for each of the thirty stocks listed therein. Def. Facts, ¶ 35.  Plaintiff explained that, at the time, she did not realize her error because she had never received explicit instructions on what the data in that column should look like. *Id.* at ¶ 36.  Similarly, in March 2011, Plaintiff made several errors on a large table called "WorldStoxx," particularly by repeatedly inputting incorrect information relating to the Venezuela market. *Id.* at ¶ 37.  These errors were reported to Plaintiff via email from another Dow Jones employee, Matthew DiCostanzo, who reviewed the WorldStoxx table prior to publication; although Plaintiff received these emails shortly after she filed the table, it does not appear that Plaintiff ever took corrective action going forward to avoid repeating these same errors. *See id.* In April 2011, Plaintiff committed errors in the creation of several tables, including the WorldStoxx table again. *See id.* at ¶ 38.  Plaintiff's problems with creating accurate WorldStoxx tables continued into May 2011, including making the same exact error after being specifically instructed to fix it the day before. *See id.* at ¶ 39.  Plaintiff admits to making all the errors identified by Dow Jones during this time period, but it is her position that these errors were the result of

---

[6]     Plaintiff disputes these facts, arguing that she was not the only employee who made errors or received supervisory guidance. *See* Pl. Resp. Facts, ¶¶ 33-35.  However, regardless of the conduct of other employees, it is undisputed that Plaintiff did in fact commit the above-noted errors and received instruction and critical feedback from her supervisors. *See id.*; *see also* Pl. Dep., T123:24-T124:10, T171:5-T178:4.  Indeed, the record reveals that Plaintiff received feedback in a 2010 performance review that she needed to improve her self-proofing skills, and that she received coaching to improve this area of her work. *See* Def. Facts, ¶¶ 33-34.

being poorly trained on the new statistics work to which she was assigned and, further, that errors by MDG employees were commonplace.  *Id.* at ¶¶ 40-45; Pl. Resp. Facts at ¶¶ 39-45.  However, absent from the record is any evidence that Plaintiff received less training, in any aspect of her job, than her coworkers.  Def. Facts, ¶ 46.

Plaintiff received her first formal discipline for her job performance on June 2, 2011, in the form of a formal written warning issued by Plaintiff's supervisor, Cristin Hoopes, and the director of human resources, Mildred Stegman (the "June 2 Discipline").  *Id.* at ¶¶ 47-48.  The June 2 Discipline informed Plaintiff that she had failed to show up adequately prepared for her assignments over the preceding Memorial Day holiday weekend, and that this resulted in her coworkers having to perform Plaintiff's work in addition to their own.[7]  *Id.* at ¶¶ 49-50.  The June 2 Discipline further recounted Plaintiff's errors in creating tables in April.  *Id.* at ¶ 51.  Although Plaintiff did not recall receiving previous oral warnings from her direct supervisors, Plaintiff admits that she had trained on the wrong table in preparation for her Memorial Day weekend assignment, and that she had received several emails regarding her errors in April from DiCostanzo alerting her to the errors she was committing; it was also Plaintiff's understanding that, following the June 2 Discipline, she could be terminated for any further mistakes.  *Id.* at ¶¶ 49, 51-52; *see also* Pl. Dep., T217:20-T218:23; *id.* at T232:5-T233:2.  After receiving the June 2 Discipline, Plaintiff commented to Hoopes and Stegman that she believed the criticism of her work might have been based on the color of Plaintiff's skin.  Def. Facts, 53.  At this comment, Stegman

---

[7]     Plaintiff asserts that certain of these facts are "disputed."  Yet, Plaintiff points to nothing in the record that raises a genuine dispute regarding these facts.  It is insufficient on a motion for summary judgment to merely state that a fact is disputed; as explained *infra*, where, as here, the moving party has satisfied its initial burden of demonstrating an absence of disputed fact, the nonmoving party cannot rest upon mere allegations; she must present *actual evidence* that creates a genuine issue of material fact.  *See* Fed R. Civ. P. 56(e).

conducted a private interview with Plaintiff, asking her to elaborate on why she believed her skin color was connected to her discipline, and to ask Plaintiff to provide those documents that Plaintiff stated she had to substantiate her claim. *Id.* at ¶¶ 54-55. After reviewing these documents and conducting an investigation, Stegman reported to Plaintiff that she had found nothing supporting Plaintiff's claim of race-based bias by Plaintiff's supervisors. *Id.* at ¶¶ 56-57. No further action was taken by Plaintiff, Plaintiff's supervisors, or Stegman on the matter.

On June 21, 2011, Hoopes and Stegman met with Plaintiff again to issue another written discipline based on Plaintiff's performance issues (the "June 21 Discipline"). *Id.* at ¶ 58. The June 21 Discipline set forth the following errors in Plaintiff's work that had occurred since the June 2 Discipline: (i) on June 16, creating a table with an empty column, and failing to check it properly; (ii) on June 17, failing to release a table for publication/failing to ensure the table reached its publication destination; and (iii) failing generally to run tests on a template prior to using it, resulting in errors. *Id.* at ¶ 59. In response, Plaintiff acknowledged that she was supposed to run different tests, familiarize herself with the templates and how to spot errors in them, and fix errors before sending them to publication. *Id.* at ¶¶ 60-62. Based on these errors, and the previously issued June 2 Discipline, the June 21 Discipline indicated that Plaintiff's performance level was "unacceptable," and that a failure to show immediate and sustained improvement would result in further disciplinary action, including possible termination. *Id.* at ¶ 63.

Around the time that Plaintiff received the June 21 Discipline, the MDG was in the process of transitioning between providers of primary source market data—*i.e.*, stock prices, volume data, and other statistics on which Plaintiff relied to perform her job. *See id.* at ¶¶ 65-66. The new data provider, Telekurs, sent its data to MDG in a slightly different format than the previous provider, and thus the templates the MDG employees used to input the data into the tables to be published

had to be revised slightly.  *Id.* at ¶¶ 67-68.  These revisions, and subsequent testing on the templates, took place over the weeks leading up to the official transition date, and on June 14, 2011, Plaintiff received hands-on training from Hoopes on how to produce a table—the "Stoxx Europe 50"—using the new Telekurs data file.  *Id.* at ¶¶ 68-69.  As part of this training, a test data file was created on Plaintiff's computer with a filename that indicated the date of creation: "20110614."  *Id.* at ¶ 70.  On June 16 and 17, 2011, Plaintiff received further training from Hoopes on how to use the new Telekurs data file for the Stoxx Europe 50 table, which Plaintiff completed successfully.  *Id.* at ¶ 71.

On Monday, June 20, Plaintiff transitioned from the previous data provider to Telekurs, and created, without assistance, the first Stoxx Europe 50 table that was based on that data and intended to be published.  *Id.*  However, when Plaintiff created the table on June 20, instead of accessing the updated data file, she relied on the test data file—20110614—from her training.  *Id.* at ¶ 73.  According to Hoopes, Plaintiff would have received an error message when she tried to import data from the test file; however, Plaintiff has no independent recollection of receiving any error message and, in any event, testified that she would click past such messages at times.[8]  *Id.* at ¶¶ 74-75; Pl. Resp. Facts, ¶¶ 74-75.  Thus, Plaintiff created the Stoxx Europe 50 table for June 20, 2011 based on inaccurate data, and this entirely incorrect table was published in *The Wall Street Journal Europe* and on WSJ.com.  *Id.* at ¶ 80.  On June 21 and June 22, 2011, Plaintiff again created the Stoxx Europe 50 table by relying on the test data file—instead of the correct, live date—and again caused the table to be published with incorrect information.  *Id.*  On June 23,

---

[8]      Other indicia that the data being relied upon was incorrect was that (i) the heading of the table read "Tuesday" when the table was being published based on Monday data, and (ii) the inaccurate date would have been revealed by "spot-check" of the imported data against an external source, which Plaintiff was required to do prior to submitting for publication.  Def. Facts, ¶¶ 77-79.

2011, Plaintiff repeated her errors, except she corrected the heading of the table to match the appropriate day of the week. *Id.* at ¶ 82. The following week, on June 28 and June 28, 2011, Plaintiff continued to create and cause to be published the Stoxx Europe 50 table using the incorrect test data file. *Id.* at ¶ 84.

On June 29, 2011, Dow Jones learned of the publication of the incorrect Stoxx Europe 50 table in the preceding weeks, and on July 14, 2011, Dow Jones ran a correction for all the incorrectly published tables. Pl. Counter. Facts, ¶ 49; Def. Facts, ¶ 86. A decision was made to terminate Plaintiff from her employment at Dow Jones, with Hoopes indicating that the publication of erroneous Stoxx Europe 50 tables in June 2011 was the worst error she was aware of in her entire career with Dow Jones.[9] Pl. Counter Facts, ¶ 50; Def. Facts, ¶ 85. At that time, however, Plaintiff was out on vacation; when Plaintiff returned from vacation on July 14, 2011, she met with Hoopes and Stegman and was informed that her employment was immediately terminated. Def. Facts, ¶ 87.

After Plaintiff was terminated, the remaining three employees in the MDG shared the work responsibilities that had previously been Plaintiff's. *See id.* at ¶ 71; Hoopes Dep., T45:8-23. For the next six months, the work of the MDG was handled by these three employees; at some point thereafter, there may have been another employee who was hired, although it is unclear from the record when or whether exactly this person was hired, who he or she was, or what position he or she occupied. Hoopes Dep., T45:24-T46:16. In spring of 2013, Hoopes hired two new employees

---

[9]     The record is unclear as to who specifically raised the idea of Plaintiff's termination, but it appears that McKay, McCullough, Hoopes, and Stegman were all involved in the decision or had knowledge of it. Pl. Counter. Facts, ¶ 50.
       Additionally, one of Plaintiff's former coworkers, Janet Yiu, who was in charge of proofing Plaintiff's work, received a written warning for failing to properly proof the incorrect tables. Pl. Counter. Facts, ¶ 48.

for the MDG—one white and one of Indian descent—such that she once again supervised four employees. *Id.* at T46:17-T48-14. Apart from these two hires in the spring of 2013, no other employees were hired in the MDG as relevant to Plaintiff's previous employment. *Id.*

On January 9, 2013, Plaintiff filed a Complaint against Defendant, asserting claims, under 42 U.S.C. § 1981 and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.* ("NJLAD"), that she was unlawfully discriminated against based on her race and/or and retaliated against for her complaints of that discrimination. Fact discovery concluded on January 10, 2014, *see* Dkt. No. 22 (Scheduling Order), and subsequently, Defendant moved for summary judgment on all of Plaintiff's claims on January 27, 2014, which Plaintiff opposed. Additional facts will be set forth as necessary.

## II.    STANDARD OF REVIEW

A moving party is entitled to judgment as a matter of law where there is no genuine issue as to any material fact. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *Brooks v. Kyler*, 204 F.3d 102, 105 n.5 (3d Cir. 2000) (citing Fed. R. Civ. P. 56(c). The burden of demonstrating the absence of a genuine issue of material fact falls on the moving party. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 305 (3d Cir. 1999). Once the moving party has satisfied this initial burden, the opposing party must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996).

Not every issue of fact will be sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Further, the nonmoving party cannot rest upon mere allegations; he must present actual evidence that creates

a genuine issue of material fact. *See* Fed R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. In conducting a review of the facts, the non-moving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party. *See Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). Accordingly, it is not the court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks*, 204 F.3d at 105 n.5 (citing *Anderson*, 477 U.S. at 249).

## III.   DISCUSSION

Plaintiff contends that Defendant discriminated against her because she is black, and/or retaliated against her for complaining of discrimination, in violation of § 1981 and the NJLAD.[10] As evidence of discriminatory and/or retaliatory treatment, Plaintiff contends that Defendant (i) failed to promote Plaintiff, (ii) changed Plaintiff's work hours to a worse schedule, and (iii) disciplined and terminated Plaintiff for errors in her work, when other employees were not disciplined or terminated for similar errors.[11] Defendant moves for summary judgment on Plaintiff's § 1981 and NJLAD claims, arguing that Plaintiff has failed to make out a *prima facie* case of discrimination or retaliation, and that even if Plaintiff has made such a showing, Defendant had legitimate, non-discriminatory, business reasons for its actions, which were not pretextual.

Both § 1981 and NJLAD discrimination claims are assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Brown*

---

[10]    Although Plaintiff's Complaint alleges that Plaintiff was discriminated against because of "her race, ancestry, and/or ethnic characteristics," review of Plaintiff's opposition brief, and the underlying record, reveals only complaints and allegations of discrimination based on Plaintiff's race.

[11]    For reasons unknown to the Court, Plaintiff's recitation of facts in her opposition brief is devoid of citations to her L. Civ. R. 56.1 statement of facts or the record. Similarly, Plaintiff fails to consistently cite her statement of facts or record in the legal analysis portion of her brief.

*v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009); *Battaglia v. United Parcel Serv., Inc.*, 214 N.J. 518, 546 (2013) ("All LAD claims are evaluated in accordance with the United States Supreme Court's burden-shifting mechanism." (Citing *McDonnell Douglas Corp*, *supra*, at 802-804.)). Under the *McDonnell Douglas* framework, a plaintiff has the initial burden of establishing a *prima facie* case of discrimination by pointing to evidence in the record sufficient to create a genuine factual dispute that "s/he suffered an adverse employment action . . . under circumstances that could give rise to an inference of intentional discrimination" on the basis of race. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008); *see also Iadimarco v. Runyon*, 190 F.3d 151, 163 (3d Cir. 1999) (requiring plaintiff who alleges reverse race discrimination to present "sufficient evidence to allow a reasonable fact finder to conclude . . . that the defendant treated [plaintiff] less favorably than others because of his race"). Evidence of discrimination is commonly presented in the form of evidence of disparate treatment, "whereby a plaintiff shows that [he or she] was treated less favorably than similarly situated employees" of a different race. *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 366 (3d Cir. 2008). Similarly, to establish a prima facie case of retaliation under § 1981 and the NJLAD, a plaintiff must show that (1) he or she engaged in a protected activity; (2) the employer took an adverse employment action against the plaintiff; and (3) there was a causal connection between the plaintiff's participation in the protected activity and the adverse employment action." *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995); *see also Victor v. State*, 203 N.J. 383, 409 (2010) (explaining that NJLAD retaliation claim requires *prima facie* showing that (1) the plaintiff belonged to a protected class; (2) the plaintiff engaged in protected activity, which was known to the employer; (3) the plaintiff was subjected to an adverse employment consequence; and (4) a causal link exists between the protected activity and the adverse employment consequence).

Once the plaintiff makes out a *prima facie* case, the burden of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action or the employer's decision. *McDonnell Douglas Corp.*, 411 U.S. at 802.  If the employer does this, the burden "rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763-64 (3d Cir. 1994) (explaining that the pretext prong requires that plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve [the employer's] articulated legitimate reasons").[12]

## A.    Failure to Promote

Plaintiff first argues that she was discriminated against when she applied for a promotion in 2007, which she asserts she did not receive because she was non-white.  Defendant contends that, irrespective of the merits of Plaintiff's failure-to-promote claim, summary judgment in Defendant's favor is proper because Plaintiff did not complain, in any manner or forum, of this alleged discrimination until the filing of the instant Complaint is 2013, and thus her claim is time-barred under both § 1981 and the NJLAD.  Plaintiff does not oppose Defendant's statute of limitations defense, let alone address the merits of her failure-to-promote claim in any way, and thus appears to have either abandoned this claim or conceded that it is time-barred.  Indeed, review of the applicable law shows that—absent any additional facts or circumstances, which Plaintiff has not identified—the statute of limitations on a discrimination claim under § 1981 is four years, and under the NJLAD is two years. *Jones v. R.R. Donnelly & Sons, Inc.*, 541 U.S. 369, 383-85 (2004)

---

[12]     Because the standard is virtually identical under § 1981 and the NJLAD for Plaintiff's discrimination and retaliation claims, I analyze both claims together.

(Section 1981); *Montells v. Haynes*, 133 N.J. 282, 294 (1993) (NJLAD).  It is undisputed that the only time Plaintiff actually applied for a promotion was in 2007, which is more than four years before the filing of her Complaint.  Plaintiff does not dispute these facts, nor does Plaintiff point to any facts that would support tolling the applicable statutes of limitations.  Accordingly, Plaintiff's § 1981 and NJLAD claims of retaliation based on Defendant's failure to promote Plaintiff in 2007 is time-barred, and summary judgment is granted in Defendant's favor on Plaintiff's claims.

**B.      Work Hours Change**

Plaintiff also appears to argue—in her L. Civ. R. 56.1 statement of material facts—that she was discriminated and/or retaliated against when her work schedule was changed sometime in January or February 2011.  Statements of material facts are not a vehicle to raise legal arguments, *see* L. Civ. R. 56.1, and, in any event, Plaintiff appears to have abandoned any such argument because Plaintiff, in her opposition brief, premises her discrimination and retaliation claims on her termination.  *See, e.g.*, Pl. Opp., 7 (describing adverse employment action in retaliation claim only as being "terminated from employment"); *id.* at 15 (setting forth law for "discriminatory *discharge*", and making no reference to change in hours); *see also Ankele v. Hambrick*, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003) (finding argument waived by plaintiff where no opposition raised to it on summary judgment) *aff'd*, 136 F. App'x 551 (3d Cir. 2005); *Desyatnik v. Atl. Casting & Eng'g Corp.*, Civ. No. 03-cv-5441, 2006 WL 120163, at *1 (D.N.J. Jan. 17, 2006) ("[W]hen a party fails to offer any argument or evidence . . . in opposition to [a] defendant's motion for summary judgement [*sic*], such claims may be deemed to have been abandoned."); *Marjac, LLC v. Trenk*, Civ. No. 06-1440 JAG, 2006 WL 3751395, at *5 n.3 (D.N.J. Dec. 19, 2006) (same).  Thus, on this basis alone, I find that summary judgment in Defendants' favor is appropriate on

Plaintiff's discrimination and retaliation claims premised on her change in work hours in early 2011.

Moreover, even assuming *arguendo* that Plaintiff could establish a *prima facie* case of discrimination or retaliation based on the change in her work schedule in early 2011, Defendant has put forth legitimate bases for the change in schedule: (i) to ensure that the necessary MDG employees would be able to adequately process the data and reports that were received late in the day, which had prior thereto been occurring at the end of the employee's previously-scheduled shifts; and (ii) to align Plaintiff's work hours with those of her coworkers.  *See* Def. Facts, ¶¶ 19, 31-32.  Plaintiff has offered no evidence to demonstrate that these legitimate bases for her change in hours was merely pretextual.  At most, Plaintiff states that this change was retaliatory because *Plaintiff* believed that she would be able to finish all of her work adequately within her previously-scheduled work hours.  Pl. Counter. Facts, ¶ 24.  Plaintiff's subjective belief regarding the wisdom of Defendant's business decision is inadequate to demonstrate pretext under *McDonnell Douglas*. *Simpson v. Kay Jewelers*, 142 F.3d 639, 642 (3d Cir. 1998) ("[P]retext turns on the qualifications and criteria identified by the employer, not the categories the plaintiff considers important."); *see also Hancox v. Lockheed Martin Tech. Servs.*, Civ. No. 04-6104 (JBS), 2007 WL 1796248, at *8 (D.N.J. June 21, 2007) ("Hancox does not support her claim with any . . . evidence other than her own testimony (that consists mainly of her opinion and conjecture regarding Lockheed's motives for terminating her).  Without more, no reasonable jury could find Lockheed's proffered reason is pretextual.").  Moreover, it is undisputed that other employees in the MDG had their hours changed around the same time as Plaintiff due to the "needs of the department," further undermining Plaintiff's contention that she was singled out because of her race.  McKay Dep., T55:1-7. Accordingly, I find that, to the extent that Plaintiff bases her § 1981 and NJLAD discrimination

and/or retaliation claims on her change in work hours in early 2011, summary judgment in Defendant's favor is proper.

**C.      June 2011 Disciplines and July 2011 Termination**

The core of Plaintiff's § 1981 and NJLAD discrimination and retaliation claims focus on the events that occurred in June and July 2011, specifically: the June 2 Discipline, the June 21 Discipline, and Plaintiff's termination on July 14, 2011, which resulted from the errors Plaintiff committed in the Stoxx Europe 50 table in June 2011.   The common thread that underlies Plaintiff's claims in this regard is her contention that she was disciplined and terminated for committing errors when other, non-black coworkers were not disciplined or terminated for their own errors.  In other words, Plaintiff argues that the real reason she was discriminated against was because of the color of her skin—she was one of the only black employees in the MDG, and all of her supervisors were white—and that she was retaliated against for complaining of this racial discrimination.   Plaintiff does not dispute that she committed the errors for which she was disciplined; Plaintiff only argues whether she should have been disciplined for these errors.  It is also undisputed that other employees committed errors in their own work during the relevant time period.  For ease of analysis, I assume, without deciding, that Plaintiff has established a *prima facie* case of retaliation under § 1981 and the NJLAD.  I therefore begin my analysis by reviewing Defendant's articulated legitimate bases for disciplining and terminating Plaintiff, before turning to Plaintiff's rebuttal evidence of pretext.

In arguing that Plaintiff's June 2 and June 21 Disciplines and her termination in July 2011 were neither discriminatory nor retaliatory, Defendant contends that Plaintiff was legitimately disciplined, and ultimately terminated, for errors Plaintiff committed, and continued to commit, in her work between March and June 2011.   In that connection, Defendant points out that it is

undisputed that Plaintiff received performance reviews beginning in 2009-2010 noting that Plaintiff was committing errors in her work and that she needed to focus more on self-proofing— well before Plaintiff contends that the alleged discrimination began. *See* Pl. Dep., T122:9-T126:8 (admitting that 2009-2010 review revealed that she had been making errors in her work); T139:21-T140:3 (testifying that she believed discrimination began in February 2011). Plaintiff does not dispute that she had been previously told, prior to 2011, that she needed to reduce the amount of errors in her work. Defendant also relies on the facts, which Plaintiff does not dispute, that in 2011, Plaintiff committed numerous errors that ended up in publication. Indeed, Plaintiff does not dispute that, during this time period, she ignored or did not comply with warnings—supplied either by the computer program she was using or by supervisors—of these errors and how to correct them. Finally, with respect to Plaintiff's termination, Defendant argues that it is undisputed that Plaintiff caused to be published an erroneous Stoxx Europe 50 table for six separate days, which, in conjunction with Plaintiff's other job performance issues, constituted a legitimate basis to terminate Plaintiff's employment. Significantly, Defendant identifies Plaintiff's errors with the Stoxx Europe 50 table in June 2011 as one of the most egregious series of errors committed by an MDG employee within the past decade, to which Plaintiff has supplied no contradictory evidence. Given these undisputed facts, I conclude that Defendant has satisfied its burden of production of showing legitimate bases for disciplining and terminating Plaintiff in 2011. I turn now to the pretext prong of the *McDonnell Douglas* analysis.

In *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, the Third Circuit clarified the plaintiff's burden at summary judgment on the pretext aspect of the *McDonnell Douglas* framework. "[A] plaintiff may defeat a motion for summary judgment . . . by pointing 'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve

the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* at 413 (quoting *Fuentes v. Perskie*, 32 F.3d at 764). To satisfy the first prong, "the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Id.* Significantly, the plaintiff "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Id.* Only if the plaintiff shows that "the employer's articulated reason was not merely wrong, but that it was *so plainly wrong* that it cannot have been the employer's real reason" can the plaintiff meet her burden of demonstrating pretext. *Id.* (emphasis added; internal quotation marks omitted). Under the second prong, the plaintiff must point to evidence in the record that "'allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" *Id.* (quoting *Fuentes*, 32 F.3d at 764). Examples of such evidence include whether (i) the employer has previously discriminated against the plaintiff; (ii) the employer has previously discriminated against other persons within the plaintiff's protected class, or (iii) the employer has treated more favorably similarly situated persons not within the protected class. *Id.* (quoting *Simpson*, 142 F.3d at 645).

Plaintiff contends that Defendant's bases for discipline and termination are merely pretextual because Plaintiff was disciplined and terminated for her errors and job performance when other employees were not disciplined or terminated for their errors or performances. In addition to this general claim of discrimination and retaliation, Plaintiff points to the following as

further evidence of pretext: (i) Plaintiff had an exemplary work record in her 15 years of employment at Dow Jones until 2011; (ii) after Plaintiff complained of her discrimination in early 2011, her supervisors talked to her differently or not at all; (iii) Plaintiff was told that her complaints of discrimination were "unfounded," even though Defendant did not conduct any investigation of them; (iv) Plaintiff was offered, on several occasions, a severance package after she complained about her discrimination; (v) Defendant did not adequately give Plaintiff an opportunity to discuss the June 2 Discipline, and even admitted that some of the bases for this discipline were incorrect; and (vi) after her termination, Plaintiff was replaced by non-black employees.   Lastly, Plaintiff argues that the temporal proximity of Plaintiff's complaints of discrimination to Defendant's actions disciplining and terminating Plaintiff demonstrates that Defendant's stated reasons are pretextual.   I address this latter argument first before reaching Plaintiff's other pretext arguments.

      1.     Temporal Proximity

Plaintiff relies on several cases to argue that "[t]o establish elements of causation and pretext, the Third Circuit often looks to . . . 'temporal proximity.'"  Pl. Opp., 11.  (citing *Fasold v. Justice*, 409 F.3d 178 (3d Cir. 2005); *Nesselrotte v. Allegheny Energy, Inc.*, Civ. No. 06-01390, 2009 WL 703395 (W.D. Pa. Mar. 16, 2009); *Annett v. Univ. Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004); *Yartzoff v. Thomas*, 809 F.3d 1371, 1376 (9th Cir. 1987); *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005); *Richard v. Cingular Wireless LLC*, 233 F. App'x 334, 338 (5th Cir. 2007); *King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003); *Alred v. Eli Lilly & Co.*, 771 F. Supp. 2d 356, 366 (D. Del. 2011); *Mason v. Transp. Solutions*, Civ. No. 2:08cv902, 2010 WL 2698308 (W.D. Pa. July 7, 2010); *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 894-95 (3d Cir. 1993); *Zielinski v. Whitehall Manor, Inc.*, 899 F. Supp. 2d 344 (E.D. Pa. 2012)).  Putting aside

the fact that most of the cases cited by Plaintiff are not Third Circuit decisions, and thus not binding on this Court, none of these cases—including those from the Third Circuit—actually support the proposition that temporal proximity gives rise to an inference of pretext; rather, these decisions discuss how temporal proximity gives rise to an inference of *causation*, in order to establish a *prima facie* case of discrimination or retaliation.  Plaintiff has not supplied, and this Court has not found, any case in which a plaintiff is able to show pretext merely by the temporal proximity of the defendant's actions and the plaintiff's alleged discriminatory or retaliatory treatment. Accordingly, I reject Plaintiff's argument that the temporal proximity of Plaintiff's complained of conduct and Defendant's alleged discriminatory/retaliatory actions, alone, adequately shows that Defendant's stated reasons are pretextual.  Instead, I address whether the evidence adduced by Plaintiff, separately or together, is sufficient to rebut Defendant's stated legitimate reasons for disciplining and terminating Plaintiff.

2.     Disparate Treatment

The core of Plaintiff's pretext claim is that she was disciplined, and ultimately terminated, for having committed errors when her coworkers were not disciplined or terminated for committing similar errors.  In support, Plaintiff supplies evidence of the plethora of errors that occurred on a weekly, or even daily, basis caused by her coworkers during the time period relevant to Plaintiff's claims.  According to Plaintiff, no other employee, with the exception of one, ever received a formal, written discipline or was ever terminated for his or her poor job performance.[13] Therefore, Plaintiff argues, Defendant's stated reason for disciplining her and terminating her employment—that Plaintiff committed numerous errors in her work—is merely pretextual because

---

[13]     The sole exception is Plaintiff's coworker Janet Yiu, who received a written warning around the time that Plaintiff was disciplined for failing to properly proof the Stoxx Europe 50 tables that Plaintiff caused to be incorrectly published in June 2011.

Defendant did not formally discipline or terminate other similarly situated employees because they committed errors.

Plaintiff's argument, while perhaps superficially appealing, is not supported by the record evidence. To begin, although Plaintiff complains that, while she was employed by Defendant, no other employees in her group received any formal discipline, there is no evidence that any other employee's job performance was similar to Plaintiff's. As the undisputed facts show, beginning in at least 2010, prior to Plaintiff's complaints of discrimination, Plaintiff was told that she needed to work on her self-proofing skills; by early 2011, it is undisputed that Plaintiff's self-proofing skills had not improved, and by the time Plaintiff received her first written discipline in June, the evidence shows that Plaintiff's job performance still had not improved and, if anything, worsened. Notably, Plaintiff does not dispute that she committed these errors. Nor does Plaintiff dispute that she was told by supervisors and other senior editors that she was making errors, as well as how to avoid making these errors in the future; yet, Plaintiff failed to improve her job performance. Indeed, during the time period that Plaintiff committed the errors for which she was disciplined, Plaintiff readily admits that she simply did not understand how to perform her job. Didier Dep., T226:8-23 (testifying that with respect to WorldStoxx tables, Plaintiff "just didn't understand" what she was doing).[14] Simply put, Plaintiff's only evidence of pretext, in this regard, is that she received formal, written discipline when others did not. The fact that Plaintiff received written discipline and others did not is not, alone, sufficient to show pretext without Plaintiff making the

---

[14]    Plaintiff testified that she did not believe she was adequately trained, which is why she was making errors. However, it is undisputed that Plaintiff received no less training than her coworkers, and it is also undisputed that nothing prevented Plaintiff from seeking and obtaining additional training. Indeed, nowhere does Plaintiff argue or suggest that her discrimination claim is based on the amount of training she received.

additional showing that other employees were performing as poorly as Plaintiff and that they did not receive written discipline; Plaintiff has not made that showing.

Furthermore, Plaintiff points to no evidence demonstrating that her discipline was contrary or aberrant to Defendant's disciplinary policy and, in fact, it is undisputed that Defendant had in place no official disciplinary policy for employees who committed errors in their work.  *See* McKay Dep., T46-47.  Furthermore, it is undisputed that other employees were disciplined for errors, just not in written form.  *See* Hoopes Dep., T92:20-T93:4.  Thus, it is not the case, as Plaintiff attempts to present, that Plaintiff was the only employee ever disciplined or reprimanded by Defendant.  In sum, Plaintiff cannot establish that Defendant's decision to issue her written disciplines was pretextually based on errors—which she does not dispute having made—and otherwise poor job performance because she has failed to show that any other employee committed similar errors *and* failed to improve on those errors, but nevertheless was not issued written discipline.  *See Simpson v. Kay Jewelers*, 142 F.3d at 645 (holding that at the pretext stage, the plaintiff has the burden of proving that "*similarly situated* persons were treated differently" (emphasis added) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981))).

Similarly, Plaintiff's argument that she was terminated from employment because of discriminatory and/or retaliatory reasons, rather than her job performance, is meritless.  Defendant's stated reason for terminating Plaintiff is the series of errors that Plaintiff committed over six days by causing to be published an entirely incorrect table of data.  Again, Plaintiff contends that this stated reason is pretextual because other MDG employees committed errors but were not terminated as a result of those errors.  However, it is undisputed that the series of errors Plaintiff committed in June 2011 on the Stoxx Europe 50 table were, as a whole, the "worst error" that Plaintiff's supervisor, Hoopes, had ever seen in her ten years of employment at Dow Jones.

Hoopes Dep., T85:9-12.  Plaintiff has put forth nothing that contradicts Hoopes' testimony, or otherwise minimizes the apparent magnitude of her errors with the Europe Stoxx 50 table in June 2011, nor does she point to other employees who committed a similarly serious series of errors. Thus there is no basis to find that Defendant's stated reason for terminating Plaintiff—that she committed the most egregious error in the MDG in the past decade—is pretextual.  *See Fuentes v. Perskie*, 32 F.3d at 764 ("[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employer action . . . ."  (Citations omitted.)); *see also Dasque v. Nordstrom, Inc.*, Civ. No. 02-5895 (AET), 2005 WL 1318866 (D.N.J. June 2, 2005) ("In this case, Plaintiff has failed to establish a pretext for discrimination . . . . Defendant's reasons for terminating Plaintiff reflect Plaintiff's history of discourteous and unprofessional behavior.  The evidence clearly shows that Plaintiff was unable to meet the professional standards required for his position at Nordstrom. . . . This Court determines that Plaintiff has failed to show that this justification for his termination was so plainly wrong that it cannot have been the employer's real reason." (Internal quotation marks omitted.).  Accordingly, I reject Plaintiffs assertion that she was disciplined and terminated for errors, when her coworkers were not, as being unsupported by the record; Plaintiff fails to show that any of her coworkers had a similarly deficient overall job performance or committed the same magnitude of error that Plaintiff committed in June 2011 that led to her termination, and, thus, Plaintiff has not carried her burden of establishing that Defendant's proffered reasons are pretextual.[15]

---

[15]    For these same reasons, I reject Plaintiff's reliance on Defendant's actions taken with respect to one of Plaintiff's coworkers, Liz Jia, in 2009-2010.  Plaintiff argues that Jia committed serious errors over several weeks, but never received any formal, written discipline as a result of

3.      Other Evidence of Pretext

I turn now to the additional, discrete, instances on which Plaintiff bases her discrimination and retaliation claims.  Plaintiff first contends that her overall work record at Dow Jones, spanning a period of 15 years, undermines Defendants' assertion that Plaintiff was disciplined and fired because of her poor job performance in 2011.  Specifically, Plaintiff argues that, prior to when she complained about being treated differently because of her race, she had never received any written disciplinary warnings and, in fact, had received only positive performance reviews.  Plaintiff's depiction of her work history is not borne out by the record.  It is true that for the vast majority of her employment at Dow Jones, Plaintiff's performance reviews reflected, at the very least, satisfactory overall performance.  However, the undisputed record evidence also reveals that starting in or around 2010, Plaintiff's reviews began to include comments that Plaintiff needed to work on her self-proofing skills, to minimize errors before sending her work to be published.  *See, e.g.*, Pl. Dep., T122:6-T126:8 (admitting that she received review indicating that Plaintiff "should continue to make progress in the area of self-proofing and making sure her work correctly posts"); *id.* at T126:9-T127:13 (admitting that employees were frequently reminded of the importance of

---

those errors.  First, although Jia was not issued a written discipline, she was verbally disciplined by Hoopes, and that discipline was memorialized by Hoopes in writing in Jia's personnel file. Hoopes Dep., T92:7-T93:4.  Moreover, following Hoopes' meeting with Jia, and the discussion of the errors Jia had been making, it is undisputed that Jia improved her job performance notably.  *Id.* at T99:17-20 (describing that Jia "did a turnaround" after her discussion with Hoopes).  Finally, it is undisputed that the errors that Jia was committing that led to her receiving a verbal warning were completely different in magnitude than the errors Plaintiff committed in July 2011.  *Id.* at T97:13-23 ("[Jia's warning] is referring to one data point out of many, that takes a very insignificant amount of space in the journal, compared to Ms. Didier's error, which takes up almost an entire half of a page with *hundreds* of data points going out stale and unchanging." (Emphasis added.)).  For these reasons, the record establishes that Defendant's treatment of Jia's errors was based on different, less egregious circumstances, and thus, it does not undermine Defendant's stated reasons for disciplining and terminating Plaintiff because Jia cannot be considered as being "similar situated" to Plaintiff.  *See Simpson v. Kay Jewelers*, 142 F.3d at 645.

self-proofing); *see also* T93:15-T98:16 (admitting that in 2006, Plaintiff received a worse overall review than she had in 2003, in part due to errors Plaintiff made in her work, and further admitting that the review arose from inadequate training and not because of anything to do with Plaintiff's race or skin color).  In sum, although Plaintiff generally performed her work satisfactorily during her employment with Dow Jones, the undisputed evidence also shows that Plaintiff had an ongoing issue with adequately self-proofing her work to avoid causing erroneous information to be published.  Notably, these negative reviews of Plaintiff's work predate Plaintiff's allegations of discrimination and retaliation.  Thus, I conclude that Plaintiff's overall job performance record does not undermine Defendant's state reason for disciplining and terminating Plaintiff from her employment in 2011; if anything, the record evidence further supports Defendant's assertion that Plaintiff's quality of work declined precipitously in her final time of employment, justifying Defendant's decision to discipline and terminate Plaintiff.

Plaintiff next argues that, after Plaintiff complained of discrimination in early 2011, her supervisors treated her differently, for example, talking to her differently or not at all, which demonstrates that Defendant's stated reason is merely pretextual.  According to plaintiff, this differential treatment is evidence of discriminatory or retaliatory animus, and thus sufficient to show pretext.  Plaintiff cites no law in support of this specific proposition,[16] and thus I analyze this aspect of Plaintiff's argument under the traditional pretext rubric—*i.e.*, whether Plaintiff has identified evidence (i) showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons, or (ii) allowing a fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse

---

[16]     Rather, Plaintiff relies on case law holding that evidence of antagonism, coupled with temporal proximity to the alleged discrimination, can establish the *prima facie* element of causation.  *See, e.g., Zielinski v. Whitehall Manor, Inc.*, 899 F. Supp. 2d 344 (E.D. Pa. 2012).

employment action.  *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403.  Here, however, Plaintiff provides no citations to the record in support of this claim, and merely references that "management" treated her differently; it is therefore unclear to the Court which supervisors and/or which interactions in 2011 Plaintiff relies on to demonstrate pretext.  At best as can be discerned from the briefing and the record, Plaintiffs' argument focuses on the facts that after Plaintiff complained of discrimination in early 2011, (i) one of her supervisors, McKay, ceased interacting with Plaintiff, (ii) Plaintiff was offered, several times, a severance package, (iii) human resources director Stegman failed to conduct an adequate investigation into Plaintiff's complaint of discrimination and failed to determine that Plaintiff was being discriminated against; and (iv) Plaintiff was not given an adequate opportunity to discuss her disciplines and, furthermore, Defendant admitted that some of the bases of Plaintiff's discipline were incorrect.[17]

Plaintiff's reliance on McKay's lack of interaction with Plaintiff following her complaint to him of discrimination is insufficient to establish that Defendant's stated reason is pretextual.

---

[17]    To the extent that Plaintiff bases her argument on how her direct supervisors, Mischutin and Hoopes, treated Plaintiff in 2011, that argument fails for lack of factual support.  To begin, contrary to Plaintiff's assertion, there is no evidence in the record that Plaintiff actually complained of discrimination to Mischutin or Hoopes apart from her meeting with Hoopes and human resources director Stegman in June 2011, at which point Stegman conducted a further inquiry into Plaintiff's allegations without Hoopes present.  The only other evidence in the record that relates to Plaintiff's relationship with Mischutin and Hoopes is Plaintiff's own deposition testimony that (i) she believed that Mischutin and Hoopes treated her differently because other employees who committed errors were not disciplined, and (ii) her coworkers told Plaintiff that they thought Mischutin and Hoopes treated Plaintiff differently.  *See, e.g.*, Pl. Dep., T31:6-8; *id.* at T33:7-18.  As to the latter, what Plaintiff's coworkers told Plaintiff is inadmissible hearsay testimony; Plaintiff clearly relies on the opinions expressed to Plaintiff by these coworkers as evidence of disparate treatment, *i.e.*, for the truth of the matter asserted.  See Fed. R. Evid. 801(c).  Such testimony by Plaintiff would be inadmissible at trial, and therefore cannot be relied on to defeat summary judgment.  *See Smith v. Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) (affirming trial court's refusal to consider on summary judgment hearsay statement offered by plaintiff where no independent basis existed for admission of statement).  As to the former, I have already addressed and rejected, *supra*, the argument that Plaintiff was disciplined for errors when others were not.

Plaintiff offers no other evidence that this behavior is anomalous or contrary to any official or unofficial policy or operating procedure for the MDG.  There is nothing in the record to suggest that McKay would be involved with Plaintiff on a daily, weekly, or monthly basis, or that it was his role to directly interact with Plaintiff in any manner.  To the contrary, the undisputed evidence shows that (i) Hoopes, Mischutin, and McCullough were the supervisors with whom Plaintiff had frequent and/or regular contact, *see, e.g.* Pl. Dep., T27 T33:11-23 (explaining that people present at meeting to discuss June 2 Discipline were Hoopes, Stegman, another human resources representative, and a union representative); (ii) Plaintiff did not frequently interact with McKay, *see* McKay Dep., T52:11-16 (explaining he supervised Plaintiff "indirectly"); Pl. Dep., T58:4-6 (testifying that her interactions with McKay were "[n]ot very often"); and (iii) decisions regarding Plaintiff's employment were made collectively by all of Plaintiff's supervisors, and there is no evidence that McKay cast any deciding vote in those decisions.  *See, e.g.*, McKay Dep., T19:15-T20:1 (confirming that disciplinary and termination decisions related to Plaintiff involved the MDG supervisors Mischutin and Hoopes, McKay, McCullough, human resources representatives, and legal); McCullough Dep., T22:20-T23:1 (describing decision to terminate Plaintiff as a "collective" one, involving Mischutin, Hoopes, McKay, and McCullough).  Moreover, Plaintiff has put forth no evidence that McKay treated Plaintiff differently than the other data integrity analysts in the MDG.  Finally, it is undisputed that when Plaintiff complained to McKay, he then conveyed Plaintiff's complaints to McCullough, who, as departmental head, held the position senior to McKay.  McKay Dep., T55:12-24; McCullough Dep., T27:17-T28:10 (explaining that McKay told McCullough in early 2011 that Plaintiff had made a "comment" about her race/ethnicity among a litany of complaints about Hoopes and Mischutin).  Thus it cannot be said that McKay ignored Plaintiff's discrimination complaint.

Even though, on this motion for summary judgment, all inferences must be drawn in Plaintiff's favor, it nevertheless remains Plaintiff's burden to show that she was discriminated against and that Defendant's reason is merely pretextual.  *Fuentes v. Perskie*, 32 F.3d at 763.  On the facts set forth above, no reasonable factfinder could find that McKay's lack of communication with Plaintiff in the four to five months leading up to her termination is evidence of discrimination or retaliation.  At most, these facts simply show that one of Plaintiff's *indirect* supervisors did not frequently communicate with Plaintiff.  I therefore conclude that McKay's failure to interact with Plaintiff following her complaint of discrimination does not establish that Defendant's articulated reason for disciplining and terminating Plaintiff—the, undisputed, numerous and severe errors that Plaintiff committed in her job in 2011—"was not merely wrong, but that it was *so plainly wrong* that it cannot have been the employer's real reason," nor does it show that that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d at 413 (internal quotations omitted).

Plaintiff also relies on the fact that she was offered a severance package on several occasions after she complained about being discriminated against as evidence of pretext.  The record is unclear as to whether Plaintiff asked for a severance package in her meeting with McCullough—and then changed her mind about it—or whether it was offered to her unsolicited.  Plaintiff argues that Defendant attempted to force a severance package on Plaintiff, stating that she "had never requested such a package."  However, in deposition, Plaintiff testified, as follows:

> [A]fter my hours were changed [in February 2011] when I went to talk to Chris [McCullough] I also told him  -- ask[ed] him *what are my options*, and I talked about the additional hour, and *I asked are there any packages because I know they would give packages*, and he said he didn't think there were any packages, but he would talk to Mildred Stegman about it . . . .

Pl. Dep., T47:22-T48:3.   Later in the deposition, Plaintiff stated that she never requested any severance package, but did so in the context of explaining her reaction when Stegman presented her with a package without any additional discussion following her initial meeting with McCullough.   *See id.* at T64:11-68:16.   Plaintiff's deposition testimony makes clear, at the very least that she raised the issue of her "options" during her meeting with McCullough, even if she disputes whether she specifically requested a severance package.   Plaintiff's contradictory testimony in this regard, alone, makes it inappropriate to rely on this fact to show pretext—it is Plaintiff's burden to show (i) weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons, or (ii) facts allowing a factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.   *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403   Here, the mere fact that Defendant offered Plaintiff a severance package—which is the only fact that Plaintiff has clearly established—is insufficient to discredit Defendant's proffered reasons for disciplining and terminating Plaintiff.   *See, e.g.*, *E.E.O.C. v. MCI Int'l, Inc.*, 829 F. Supp. 1438, 1462-63 (D.N.J. 1993) (holding that offer of severance package is not itself indicative of discrimination).

Similarly, even assuming *arguendo* that Plaintiff is correct—*i.e.*, Defendant offered Plaintiff a severance package without her requesting one—Plaintiff still has failed to carry her burden of showing how this demonstrates that Defendant's articulated reasons are pretextual. Plaintiff points to no evidence that (i) proposed severance packages were inconsistent with any official or unofficial Dow Jones policy; or (ii) any ultimatum was attached to the specific severance package offered Plaintiff, *e.g.*, that Plaintiff either accept the package or face discipline.[18]   Without

---

[18]   As evidence that the severance package is evidence of pretext, Plaintiff offers an email from Stegman to McCullough, dated May 25, 2011, in which Stegman notes that Plaintiff declined the last, and final, offer to accept the severance, and further detailing that the next step is to "issue

such evidence, courts have rejected the argument that the offer of a severance package is sufficient to show pretext.  *See, e.g.*, *Arenas v. L'Oreal USA Prods., Inc.*, 790 F. Supp. 2d 230, 238-40 (D.N.J. 2011) (rejecting contention on summary judgment that severance package showed discriminatory animus where no evidence that package was offered for any reason other than to avoid laying-off older employees), *aff'd*, 461 F. App'x 131 (3d Cir. 2012); *cf. Fenter v. Kraft Foods Global, Inc.*, Civ. No. 11-4916, 2012 WL 5586327 (E.D. Pa. Nov. 14, 2012) (finding pretext not established where plaintiff offered no evidence to show that employer decision to not offer severance package was inconsistent with employer's policy).  Indeed, the record evidence here shows, at most, that Plaintiff expressed several concerns to her supervisors about how she was being treated at work—only one of which was related to her race—and that she made it clear that she was seeking "options" for how to resolve her workplace environment.  Defendant's decision to offer Plaintiff a severance package—vetted by Plaintiff's own union—is not the type of fact that any reasonable factfinder could rely on to determine that Defendant's stated reasons were pretextual.  Thus, even were I to find that there was sufficient evidence in the record to support Plaintiff's contention that Defendant offered, unsolicited, a severance package to Plaintiff following her complaints of discrimination—which, as I stated above, I do not find to be the case— I would nevertheless still conclude that this evidence is neutral on its face and thus insufficient to call into question Defendant's proffered reason of disciplining and terminating Plaintiff.

---

the warning letter."  *See* Pl. Opp., Ex. I.  Nothing in the email shows that Plaintiff was told to accept the severance or face discipline, thus Plaintiff has not shown that Defendant's decision to proceed with the disciplinary process—based on serious errors that Plaintiff does not contest that she made over the preceding months—undermines Defendant's proffered reason for disciplining and terminating Plaintiff.  *See Arenas v. L'Oreal USA Prods., Inc.*, 790 F. Supp. 2d 230, 238-40 (D.N.J. 2011) (finding offering of severance package not indicative of pretext where package was intended to avoid other negative consequences).

Plaintiff also argues that pretext is shown by Defendant's failure to adequately acknowledge Plaintiff's complaints of discrimination.   Specifically, Plaintiff argues that (i) McCullough and/or McKay did not conduct an investigation of Plaintiff's complaints in early 2011, and (ii) Stegman did not conduct a sufficient investigation when Plaintiff repeated these complaints in her meeting with Stegman in connection with the June 2, 2011 discipline.  As to the former, McCullough and McKay testified that they did not formally investigate Plaintiff's early-2011 complaint because Plaintiff only mentioned her belief of race-based discrimination in passing, among a host of other complaints of her supervisors, and it did not appear to them that Plaintiff was making an actual allegation of discrimination.  *See* McKay Dep., T55:1-11 ("[W]hen [Plaintiff] was complaining about her managers, she made reference to the rest of the team feeling the same way, which indicated to me she was not being singled out for race or otherwise."). McCullough similarly testified that Plaintiff did not seem to be lodging an actual discrimination complaint in early 2011, and that, to the extent that she was, he interpreted her complaint as being identical to complaints that Plaintiff had made previously in her employment, which had been investigated and found to be baseless—a finding that Plaintiff has never since challenged.  *See* McCullough Dep., T26:2-8.  Plaintiff does not dispute these facts, and thus I do not find that McCullough and McKay's failure to conduct a formal investigation into Plaintiff's comment of discrimination in early 2011 is sufficient to show that Defendant's stated reasons are pretextual.[19]

Turning to Plaintiff's assertion that Stegman failed to conduct an adequate investigation of her discrimination complaint in 2011, the undisputed facts show that Stegman acted swiftly and

---

[19]      Although a formal investigation may have been the more prudent course of action, the inquiry is not whether Defendant's action was "wise, shrewd, prudent, or competent," but rather whether it was motivated by discriminatory animus.  *Fuentes v. Perskie*, 32 F.3d at 765.  In light of the undisputed facts noted above, Plaintiff has failed to establish any such animus.

thoroughly when Plaintiff raised concerns of discrimination—Stegman immediately conducted a private interview with Plaintiff, outside the presence of her supervisors, and requested Plaintiff turn over any and all documents she had that substantiated her claim.  Stegman reviewed these documents, but ultimately determined that Plaintiff's discrimination claim was not borne out by the evidence.  In challenging the adequacy of Stegman's investigation, Plaintiff does not contest that Stegman actually investigated her claim, nor does Plaintiff point to anything that Stegman should have done in addition to the investigation she actually conducted.  Rather, Plaintiff's challenge to Stegman's investigation is simply based on Plaintiff's subjective belief that Stegman erroneously concluded that there was no evidence of discrimination against Plaintiff—*i.e.*, Plaintiff disagree with Stegman's finding of no discrimination.  In light of the undisputed facts that Stegman conducted an investigation, and the lack of objective evidence showing that her investigation was incomplete or otherwise lacking, Plaintiff's subjective belief regarding the correctness of the result of Stegman's investigation is insufficient to raise a genuine dispute demonstrating that Defendant's articulated reasons are mere pretext.  *See Simpson v. Kay Jewelers*, 142 F.3d 639, 642 (noting that plaintiff's subjective belief is irrelevant to pretext analysis); *see also* Fed R. Civ. P. 56(e) (providing that, in opposing summary judgment, nonmoving party cannot rest upon mere allegations but must present actual evidence that creates a genuine issue of material fact).

For similar reasons, I reject Plaintiff's claim that she has established pretext by showing that (i) she was not given an adequate opportunity to discuss the June 2 Discipline and (ii) Hoopes admitted that one of the bases of the June 2 Discipline should not have been attributed to Plaintiff's error.  First, as discussed above, the undisputed facts reveal that Plaintiff had an opportunity to meet with her supervisor and human resources to discuss the June 2 Discipline, and that when Plaintiff raised the issue of discrimination, Stegman immediately conducted a private discussion

and subsequent investigation.  Nothing in the record shows that Plaintiff was prevented from engaging in a meaningful discussion regarding this discipline.  Moreover, it is also undisputed that Plaintiff submitted a letter in response to the discipline, which was reviewed by Hoopes.  *See, e.g.*, Hoopes Dep., T68:9-T78:17.  Plaintiff points to no facts supporting her argument that she was unable to discuss the June 2 Discipline with her supervisors or human resources.  To the extent that Plaintiff argues that she was disciplined without receiving any prior warning, the record is, at best, unclear in that regard.  Plaintiff testified in deposition that prior to receiving the June 2 Discipline, she could not recall all her conversations with Hoopes.  Nevertheless, Plaintiff acknowledged that she frequently received emails from DiCostanzo during the relevant timeframe, on which Hoopes was copied, informing her of the errors she was committing.  Didier Dep., T211:9-T217:1.  These errors, among others, formed one of the bases of the June 2 Discipline.  For that reason, Plaintiff cannot claim that she was not on notice that she was committing the errors that formed one of the bases of the June 2 Discipline.  Indeed, as with the other errors Plaintiff made throughout 2011, there is no dispute that Plaintiff actually committed the errors on which the June 2 Discipline was based, except as noted in the following paragraph.  Thus, even if there is some question as to whether Hoopes personally brought these errors to Plaintiff's attention prior to June 2, 2011, it is undisputed that Plaintiff knew she was committing errors that should have been corrected.

As to Plaintiff's contention that June 2 Discipline was premised on errors that were not her fault, it is true that, in reviewing Plaintiff's letter in response to the June 2 Discipline, Hoopes acknowledged that one of the errors attributed to Plaintiff should have instead been attributed to another employee.  *See id.* at T77:9-19.  However, this single mistake is not enough to demonstrate pretext, as Hoopes reaffirmed that the *numerous* other errors in the June 2 Discipline were properly

ascribed to Plaintiff.  *See id.* at T68:9-T78:17.  Plaintiff has identified nothing else in the June 2 Discipline that is incorrect, or that would otherwise give rise to a suggestion of discriminatory animus, and thus I reject this aspect of Plaintiff's pretext argument as well.

Finally, Plaintiff's argument that pretext can be shown by Defendant's hiring of non-black employees to replace Plaintiff is unavailing.  The undisputed facts show that Plaintiff was terminated in July 2011, and that no employee was hired to replace Plaintiff's vacant position in the MDG until sometime in the spring of 2013—nearly two years after Plaintiff was terminated.[20] This lengthy amount of time between Plaintiff's termination and the hiring of new employees does not show that Defendant's articulated reason for disciplining and terminating Plaintiff was pretextual.  As Plaintiff has offered no other evidence in this regard, I find that Plaintiff has not shown that any reasonable factfinder could conclude that Defendant terminated Plaintiff in order to replace her with a non-black employee.

In sum, although Plaintiff attempts to portray a discriminatory and/or retaliatory relationship between Plaintiff and her supervisors in the first half of 2011, following her initial complaints of racial discrimination, the undisputed facts in the record do not support Plaintiff's depiction.  Even viewing Plaintiff's interactions with her supervisors during this time period as a whole, the record does not demonstrate that Defendant acted with discriminatory or retaliatory animus toward Plaintiff.  Plaintiff's assertion that she was treated differently because of her race is based entirely on Plaintiff's subjective belief, and is not corroborated by any evidence in the record.  Accordingly, I reject Plaintiff's contention that Defendant's stated reasons for disciplining Plaintiff and terminating her employment are merely pretextual.  Instead, I conclude that the

---

[20]     Hoopes' testimony that some employee "may" have been hired around six months after Plaintiff left is too vague and speculative, without more, for Plaintiff to rely on evidence that someone was in fact hired around that time.

undisputed record evidence supports Defendant's stated reasons for disciplining and terminating Plaintiff.  Indeed, Plaintiff acknowledges that she made frequent and repeated errors in her work, despite receiving instruction on how to rectify and prevent those errors.  Significantly, Plaintiff puts forth no evidence that undermines Defendant's contention that Plaintiff's errors committed in July 2011 with the Stoxx Europe 50 were the worst committed by Defendant's MDG in at least a decade.  Overall, the record evidence shows that (i) no similarly situated employee was treated differently; (ii) Plaintiff did not believe she was discriminated against prior to her decline in job performance, and (iii) when Plaintiff raised serious complaints of discrimination, Defendant investigated those complaints, and even attempted to offer Plaintiff a chance to leave her employment with severance.  Thus, viewing the record as a whole, it is clear "that the circumstances of this case . . . reflect a situation in which the employer should have been able to take adverse employment actions against the employee without fear of being embroiled in an expensive law suit . . . no . . . jury could conclude that [Defendant's] articulated reasons for its adverse employment actions were a pretext for discrimination."  *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d at 414.  Accordingly, summary judgment is granted in Defendant's favor on all counts of Plaintiff's Complaint.

**CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment on Plaintiff's Complaint, alleging violations of 42 U.S.C. § 1981 and the NJLAD, is granted.

Date:  August 15, 2014                                   /s/ Freda L. Wolfson
                                                         Hon. Freda L. Wolfson, U.S.D.J.